This is a writ of error, in nature of a bill of review, brought to reverse the decree of Adams Superior Court in Chancery. The errors assigned, are the general errors, and will bring the whole case before the court. In order clearly to show the grounds of the judgment of this court, a short Statement of the case will be required. The bill charges, that Frederick Calvit, the ancestor of the defendants in the year 1788, obtained a patent from the Spanish government for 500 acres of land, that in the year 1790. *55 he made his will, and devised the lands in controversy to his wife and children, giving her a life estate in her portion, appointing John Bisland, Thomas M. Green, Thomas Calvit and his wife executors and executrix to his said will — that no authority was given by the said will to the exe-utors, to sell the land — that some of the children were of age, but the defendants were infants under age and of tender years. The bill also charges, that the estate was sold under the authority of the Spanish government, and John Roberts became the purchaser. That Roberts devised the lands to James Stewart jun., but it became necessary to sell the land for the payment of Roberts’ debts, and the complainant became the purchaser. That two of the defendants were present, and John F. Bowie, the guardian of the other defendants, knew of the sale to the complainants, made ns objections, nor did they make known their claim. That John F. Bowie, solicited the complainants to make the purchase. The bill does not deny that complainants had notice of defendants title. The answer denies all the material facts, to wit: the sale under any authority of the Spanish Government, that Roberts did not purchase under the pretended sale, but the purchase was made by the mother of the defendants, that no assent of theirs was given to the purchase by complainants, charges that complainants had both express and implied notice of their (title.
A preliminary point was made in the argument of this cause, by what law the sale by the executors was to be governed, whether by the Spanish or by the laws established by the acts of Congress for the government of the Mississippi territory. It is not very material whether this point be' decided or not, as the opinion of the court would be the same, the rules of both are analogous, and would bring the court to the same result. But the point having been taken, and insisted upon, the court will dispose of it. It is a subject of regret, that our libraries furnish few treatises on the laws of nations, from which light might be obtained to elucidate the point in question. The court will have to rely on Vatell, and some English authorities. Vatell 455, speaking of the rights of conquest by war saysj a Prince taking a town or province from an enemy, can justly acquire over it, the same rights only, as belonged to the sovereign against whom he had taken up arms — war authorised him to possess what belonged to hisenerfty — if he deprives him of the sovereignty of a town or province,* *56 he acquires it as it is, with all its limitations and modifications. And again 455 he says, if’the sovereign, be only the just object of his complaint, reason declares, by his conquest, he acquires such rights only, as belonged to the dethroned sovereign, and on the submission of his people, he is to govern it according to the law of the State. The above doctrine is recognised by Lord Mansfield, in the celebrated judgment he gave in the case of Campbell vs. Hull, Cowp. 209, he says, the laws of a conquered country continue in force, until they are altered by the con queror. 1st. Black. 108 says, but in conquered or ceded countries, that have already laws of their own, the King may indeed alter and change those laws, but until he d'oes actually change them, the ancient laws of the country remain. In Calvin’s case, 7 Rep. 17 the same doctrine is recog-nised. That Spain, until the fail of 1798, exerbised jurisdiction over this country, is not controverted. Whether this jurisdiction was rightful is not the subject of enquiry — it is sufficient if it was a government de facto’ but that she had some semblance of right, is evident from her treaty with the United States. One of the objects of that treaty was to settle the limits, and there was a stipulation in the treaty, that if any portion of her subjects should be found within the limits of the United States, as agreed upon time was given for their removal, if conquest and cession make no alteration in the civil laws of nations, what would place the government of Spain on different grounds? — I know not, and this may be laid down as a general principle, that the change, of one form of government for another from whatsoever cause it may arise, the municipal laws remain unimpaired, until changed and altered by the new government. Our own revolution, the different revolutions in England and France, and the history of all countries prove this. The usurpation of Cromwell in England, the de-' thronement of the Bourbons in France, the establishment of the republic, and afterwards the Imperial dynasty of Napoleon, did not abrogate the municipal regulations of either of. those nations. Rome, under all her mutations, was governed by the civil law. If these principles he just, and I think them consonant with justice, and the laws of nations, an important inquiry arrises, at what lime the civil law ceased in this country. From the testimony of Col. Steel, the first Secretary under the territory, the government was not organized until the beginning of the year ]799 *57 —that the civil law did not cease to operate until the organization of the new government, from the above principles, if they be correct, must be obvious, and the court is sustained in the positions assumed, by the act of the 7th April 1798, which act goes far to show the opinion Congress held upon this subject. By the 6th section Congress declares, that from and after the establishment of the said government, the people of the aforesaid territory, shall be entitled to, and enjoy, all and singular the rights, privileges and advantages granted to the people of the United States north west of the river Ohio, in and by the aforesaid ordinance of the 13th July 1787, in as full and complete a manner, as the same are possessed and enjoyed by the people of the said last mentioned territory. The act requires the new government to be organised, before the ordinance should operate, and become the law of the land. The evidence is, that the sale of the executors, was on the 1st April 1798. The court is therefore of opinion, that the civil law prevailed, and the sale of the executors must be governed by the Spanish law.
Having thus disposed of the preliminary point, the following case is presented for the consideration of the court. 1st. Had the executors power under the will, or the laws of Spain, to sell the land? 2nd. Have the defendants, by any acts of their own, raised an equity sufficient to preclude them from enforcing the judgment at law? To the first point, had the executors power under the will, or the laws of Spain, to sell the ■real estate? By the civil code 246, the executors can sell moveables if there are not assets sufficient to pay the legacies. He cannot sell immovea-bles, although .authorised by the testator, if all the heirs are present, and they are forced heirs.
When an executor has seizen of the property, and is directed to sell, he must proceed to the sale, and payment of the debts of the succession, in the manner prescribed to the creditors of absent heirs, and vacant successions, page 244, the testator may give to his testamentary executor the seizen of the whole succession, or only a determinate part, according as he has expressed himself. If testator has not given seizen to his testa, mentary executor, he cannot acquire it. But if the executor testamentary, be merely and simply appointed, without any other power, his functions are confined, to the execution of the legacies, contained in the will, *58 to cause the inventory to be made, and other acts conservatory of the property of the succession, even when the testamentary executor has been appointed detainer of the property, or expressly authorised by the testator to take possession of it. If there are any forced heirs, they may prevent the seizen of the testamentary executor, by offering him the necessary sums to pay the legacies, or by securing their payment. It is admitted by the complainants, that no power is given by the will to the executors to sell, but it is contended, that a power was given by a court of competent jurisdiction. From the authorities cited, these principles may be assuined, as clearly established, that a power to sell immoveables, must be expressly given by testator, the only exception is in the case of absent heirs, not represented, then the law authorizes seizen whether granted or not, or whether the heir be forced or testamentary, and gives a power to sell. See Civil Code. The exception, sufficiently establishes the rule to be as laid down, viz: that before executors, can take possession of a succession, the testator must expressly authorize them so to do by his will.
That appointing an executor, simply, without any other power, bis functions, are confined, to the execution of the legacies contained in the will, the making of the inventory and other conservatory acts of the property of the succession. An application of the evidence to these principles, drawn from the civil code, puts the question of sale by the executors at rest, and I take it tobe clear also, that before any Spanish tribunal could have given an order of sale, the executors ought to have brought themselves, within the exceptions of the first principles laid down, by showing that the heirs were absent, and not represented here. But no such pre-tence is set up, on the contrary, it appears from the evidence in the case, that they were all present, and the defendants were infants, that John Bis-land, Thomas M. Green and Thomas Calvit were simply executors, and had no power, under the will, either to take seizen, or to sell, is clearly proved from the will, and from the authorities cited, that the sale was without authority of law, is further proved, by the doctrine of successions under the civil law. The civil law acknowledges three kinds of heirs, legal, testamentary, and irregular — Civil code 164. The acceptance of an inheritance simply, binds the heir to pay all the debts of the ancestor, and if the succession is not sufficient, he is bound to pay them out of his own *59 estate, and becomes personally liable for their payment, in fact he stands in the place of the deceased. But if he accepts the inheritance with the benefit of an inventory, then he is bound only so far as the effects of the succcession go, he then assumes the same character as an executor or administrator, under our law. Infants, by their tutor and curator, can accept an inheritance Civ. Code, 162. The heir, whether legal or testi-mentary, by the civil law, stands in the place of executor or administrator in our law, and the power of the executor, when he is simply an executor, by the civil law, is confined to see, that the will is duly executed, by those who have the seizen of the estate. That they have no right to • interfere in the disposition of immoveables, I think has been clearly demonstrated by the authorities, nor have the complainants shown, that any tribunal known to the laws of Spain, has the right to cloathe the executors with this power.' Uuntil that is shown, it would be loss of time, to enter into the discussion of the presumption, that the executors had sold under an order of a Spanish tribunal, but that the evidence is lost through casual- ■ ty and length of time. One of the counsel for complainant argued ingeniously*, that Mrs. Roberts, under the law of acquests and gains, was entitled to one half of the land,.and her standing by and suffering the land to he sold, bound her, and vested a title m one half of the land in complainant through the mesne conveyances; and cited civil code 336, and a case in Martin’s Reports, 3 vol. 456. Upon an examination oi the authorities cited, I am of opinion, they do not warrant the conclusions drawn from them by the learned counsel. For, by law, as laid down in the digest,, this partnership .or community consists of the profits of all the effects of which the husband has had administration, and enjoyment, of the produce and reciprocal labor and industry of both husband and wife, of the estates which they may acquire during the marriage, either by donations made,., jointly to them both or by purchase &c., and again in art. 67, same page, at the time of the dissolution of the marriage, all the effects which both .- husband and wife possess reciprocally are presumed common effects or • gains, unless it is satisfactorily proved, which of the said effects they brought in marriage, has been given to them separately, or they have-respectively inherited. By recurrence to the patents, we find the title is vested solely in Frederick Calvit, this is tne strongest evidence of his sale *60 title, that all grants of lands by the Spanish government to settlers is expressly donative, is manifest from the patents and is a fact not to be controverted; the conditions of the settlement cannot alter their nature, besides, those conditions were never enforced, and were for the benefit of the grantee, not of the grantor. The expences paid the officers for the operation of survey, and for issuing the patents, are collateral, and do not enter into the consideration of the grant, and cannot convert what is dona-tive into a purchase. That Mrs. Roberts, possessed no other title, but through the will, which was a life estate, for one third of the land, a reference to the patent, and will, sufficiently establishes. It is unnecessary to enter into the consideration, who was the purchaser under the sale made by the executors, the court being of opinion, that no title was conveyed by the said sale, the same being made without authority, and against the laws of the country, is consequently void, and of no effect.
The second enquiry to be made is — Have the defendants, by any acts of their own, raised an equity, sufficient to preclude them from enforcing their judgment at law. Much learning has been shown, many ingenious arguments have been used, and many authorities have been cited both pro and con. Before we enter into an examination of the authorities, a recurrence to the bill will be necessary. The bill charges, that Alexander Calvit, Joseph Calvit and John F. Bowie, knew that the sale was about to be made by Stewart, stood by during the sale, and did not make known their title, that he purchased for a full and valuable consideration, from which he expects to raise an equity sufficient to preclude the defendants. The complainant does not deny in his bill, but that he had notice of the defen dant’s title, nor does he come into this court, as a bona fide purchaser for valuable consideration, and without notice of defendant’s title, he founds his claim to the interference of the court, upon the circumstance, that some of the defendants had knowledge, that Stewart was about to sell the land, and their silence when the sale took place as to their title, and any claim they had. So material an allegation, as the want of notice, if the fact really existed, from the great ability discovered in the draft of the bill, could not have escaped the learned counsel who drew it. The want of notice, is a substantial matter, and if it existed,, no doubt v/ould have made a prominent feature in the bill. But indcpendaat of the strong in- *61 ferencethat may be drawn from the circumstance of its not having been stated, let us examine this case, by the authority of other adjudged cases.
I will first state the rules and principles by which courts of equity are governed, and then apply the evidence.
Lord Hardwick, in giving judgment in the case of Willoughby, and speaking of what persons are entitled to the protection of a court of equity says, in the first place, he must be a purchaser for a sum paid, or for a valuable consideration, he must be a bona fide purchaser, not effected by any fraud or collusion — he must be a purchaser without notice of the prior conveyance, for notice makes him come in fraudulently. In 2nd Viner 569, and 600, Lord Cowper lays it down to be a rule in equity, that where a man is a purchaser for a valuable consideration, without notice, he shall not be disturbed in a court of equity, not only where he has a prior legal claim, but where he has a better right to call for the legal estate than his. adversary. The above are the rules of a court of equity, and before a party can protect himself, he must bring himself within them. Independent of the strong interference to be drawn from the silence of the complainant, as to notice, let us examine the evidence, and see how far that establishes the notice of the title of defendants. What is sufficient to put a purchaser upon enquiry, is good notice, that is when a man has sufficient information, to lead him to a fact, he shall be deemed cognisant of the fact — Smith vs. Low — Atkins 4S9. In all cases, where a purchaser cannot make out a good titie, but by a deed which leads him to another feet, whether by description of the parties, recital or otherwise, he will be deemed cognisant thereof, for it was crassa negligentia that he sought not it — 1 Ch. C. 287,2 Ch. C. 246,2 Ver. 384 662, Ambler 313, 2 Br. C. C. 291. In such cases, the inquiry must be made by the purchaser, and every essential document in the chain of title, is required to be examined by him, unless, indeed, its. genuineness or legality be admitted in some other deed of the original vendor, and the adverse claim be not from the same vendor, or some one claiming under him, for if the adverse claim come by sale from the same vendor, thro’ whom the first purchaser claims, it matters not by what fraud or crime the title may have been procured after it has passed for a valuable consideration into the hands of a third person without actual not'op — 6 Cranch 87. The deeds from the *62 executors to young Stewart, the deed from Stewart, executor of Roberts to the complainant recitets and adduces the title from Frederick Calvit, and recites the sale made by his executors. Were not these recitals sufficient to put the complainant upon inquiry — ought he not to have seen that Cal-vit’s executors were authorised to sell the land, and the mere recital in a deed is evidence of notice — Ambler 311 — and ihe cases above cited. It is also in evidence, that the complainant took advice of counsel, and the conversation related by one' of the witnesses, goes- far to show, that the complainant, before the purchase, knew the titles were defective, or why did Bowie say he never would inform his children of their right until he was on his death bed? From the factsj the court is of opinion, that the complainant had notice of defendant’s title, and according to the rules laid down, one of the principal ingredients is wanting, as a purchaser must be a bona fide purchaser, and without notice, before a court of equity will interfere, and a man purchasing with notice, the law says the purchase is fraudulent, and closes the doors of a court of equity against him. But it is contended, that the knowledge of the sale by the young Calvits, and their silence, raises an equity. The rule of equity is predicated upon the purchasers being ignorant of the fact necessary and requisite to be made known, to make him innocent, that the party to be effected, must have a knowledge of his right, and must suppress it for some fraudulent purpose,. —2 Ver. 554, Domat 365,3 Term R. 56. There are some decisions to the contrary, but they have been overruled, and the principle upon examination, will be found as I have laid it down. Ignorance of a fact necessary to be known, and the suppression1 of that fact by a party having title, that suppression, to he fraudulent, the above ingredients must concur.. That the complainant was not ignorant of the tile of the defendants, has already been decided, hence the rule cannot embrace his case. But it is said, the circumstance of the defendant’s .suffering"the title papers to remain in the hands of Stewart, enabled him to commit a fraud on the complainant. Among mortgagees, the rule laid down by Lord Chancellor Thurlow, is, that nothing but a voluntary, distinct and unjustifiable concurrence on the part of the first mortgagee, to the mortgagors retaining the title deeds, shall be reason for postponing his equity. But can this rule apply to aid the "complainant, when the title papers themselves would *63 'have furnished him with evidence, that Stewart had no title to the estate* The rule of Caveat Empton applies with more propriety. It is also contended, that the acts of John F. Bowie, ought in equity, to divest his children of their rights. Can John F. Bowie legally convey the title of his children? The answer must he in the negative. If he could not do it as guardian, would it not be absurd to contend, he could do it by the commission of a fraud? Is there any rule of law or equity that says, infants can be divested of their rights by the fraud of their guardians? I think not. Insecure indeed would be the estate of infants, if such doctrines were to prevail in our courts. The complainant also contends, that the receipt given the executors, in equity, ought to be considered as a release. Before this could be done, it ought to be shown that they knew their rights, and that the sale made by the executors was void, but no such evidence is offered; the only testimony is, that of Mrs. Boyd, who says, that James Calvit informed Alexander Calvit, that Stewart was about to sell the land, when he replied “ he did not care, heknew how,” from which the witness inferred that Alexander Calvit had some title. No case has been produced where a court of equity had decreed against heirs under such circumstances. The law in favor of heirs, never permits their lands to be taken from them by mere implication. For these reasons, I am of opinion, that the complainant wants and stands divested of two ingredients necessary to entitle himself to the protection of this court, that is to say, a clear bona fide title, and the first and best right to call for the legal estate. The decree below to be affirmed, and complainant decreed to pay defendants their costs.
JVofe. Whatever doubts may have at one lime existed as to the question, now settled by the Supreme Court of the United States, whether any part of this terri- ■ tory North of latitude 31, was ever embraced within the limits of British West Florida^ is certain, that Spain had scarcely the shadow of a claim to this territory. Independent of the fact, that this territory was not embraced within the limits of British West Florida, and consequently that Spain could receive no valid title from Great Britain; it is clear, that Great Britain did not undertake to sell to Spain, or the latter to purchase the territory in question. On the 20th of Nov, 1832, the provisional treaty of peace, between the United States and Great Britain was executed, by which, the territory in question, was acknowledged to be within the limits of the United States, and the 31st degree oí North latitude, fixed asa boundaiy. This treaty was made by public instrument, and was well known to Spain, when subsequently, on the 20th of January 1783 she acquired Florida from Great Britain. No such fraud was attempted by Great Britain, as the sale of territory to Spain, previously relinquished by GreatBritain to the United States* But it is said Spain established a government de facto here. Upon the same principles, her grants of land should be valid, yet they are not. Why then are her grants declared to be void ?■ Because her laws could convey no title to any one. How then could they govern the transfer and descent of the lands? Her occupancy was a usurpation, and during the whole period, Georgia extended her legislation here. This territory, designated by Georgia as Bourbon county, was then as much a part of Georgia, as any other county in that State, and when her laws conflicted with those of Spain, which must controul ? A different view of the Spanish treaty of October 1795, seems to have been taken by the Supreme Court of the Union in 12 Wheaton 535, from that expressed in this case.